

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

November 7, 1997

The Honorable Steven D. Wolens
Chair, State Affairs Committee
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

The Honorable Senfronia Thompson
Chair, Judiciary Committee
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-453

Re: Whether Harris County must hold a referendum election before imposing certain taxes authorized by House Bill 92, Act of May 22, 1997, 75th Leg., R.S., ch. 551, 1997 Tex. Sess. Law Serv. 1929, 1929 (RQ-1002)

Dear Representatives Wolens and Thompson:

You have requested our opinion regarding House Bill 92, Act of May 22, 1997, 75th Leg., R.S., ch. 551, 1997 Tex. Sess. Law Serv. 1929, 1929. That bill authorized certain political subdivisions to create "venue districts" to "plan, acquire, establish, develop, construct, or renovate. . . . venue projects." Local Gov't Code ch. 335. Pursuant to that authority, Harris County and the City of Houston established the Harris County-Houston Sports Authority (the "authority") as of September 1, 1997. The authority is about to begin construction of its first "venue project," the Ballpark at Union Station, a facility for major league baseball.

House Bill 92 authorized municipalities and counties to impose, *inter alia*, a short-term rental tax on motor vehicles of Local Government Code section 334.102,[1] and a special hotel occupancy tax, Local Gov't Code § 334.252,[2] as a means of financing "venue projects." The provisions of House Bill 92 permitting these taxes were made contingent upon their approval by the voters:

> A municipality or county may impose a tax under this subchapter [short-term motor vehicle rental tax] only if:
>
> (1) an approved venue project is or is planned to be located in the municipality or county; and

---

[1] Local Gov't Code § 334.103 (tax not to exceed 5 percent).

[2] *Id.* § 334.254 (tax not to exceed 2 percent).

(2) the tax is approved at an election held under Section 334.024.[3]

*Id.* § 334.102(c). House Bill 92 also contained a grandfather clause that obviated the need for a second election to impose these taxes in certain situations:

> SECTION 7. Notwithstanding any other provision of Chapter 334 or 335, Local Government Code, as added by this Act, an election to approve a sports and community venue project, to approve a method of financing for the venue project, other than the imposition of a sales and use tax or a facility use tax, or to create a sports and community venue district in a specific county or municipality is not necessary if, at an election held before the effective date of this Act, the voters of that county, or of the county in which the municipality or district is primarily located, authorized the establishment and operation of new or renovated stadiums, arenas, or other facilities for professional sports teams. This section:
>
> > (1) negates the necessity of an election only for the type of venue project approved at the previous election; and
> >
> > (2) does not negate the necessity of an election for approval of the imposition of a sales and use tax or a facility use tax to finance a venue project.

An election to which section 7 clearly refers was held in the City of Houston and Harris County on November 5, 1996. A majority of the voters approved the following ballot proposition:

> Authorizing Harris County to establish and operate new or renovated stadiums, arenas, and other facilities for professional baseball and football teams, provided that no county real or personal property taxes are spent to acquire, construct, or equip these facilities.

You first ask whether Houston and Harris County must hold another referendum election prior to imposing the taxes authorized by House Bill 92. You suggest that, since the ballot proposition did not disclose that the special hotel occupancy tax and the short-term car rental tax would be used as a method of funding, those taxes may not be levied without a second election. In addition, you contend that, to the extent that section 7 purports to authorize such taxes without a second election, it contravenes the due process clauses of the state and federal constitutions.

---

[3]Section 334.252(b) of the Local Government Code uses identical language with regard to the special hotel occupancy tax.

We note initially that, in Attorney General Letter Opinion 96-120, we approved the specific ballot proposition at issue here, finding that it "contains a fair description of the proposition[4] submitted such that it can be understood by those entitled to vote and submits the question authorized by section 323.003[5] with such definiteness and certainty that the voters will not be misled." Letter Opinion No. 96-120 (1996) at 4.

Except for the special requirements of House Bill 92, neither hotel occupancy taxes nor car rental taxes require a referendum before they may be imposed. Section 351.002 of the Tax Code permits a municipality to levy a hotel occupancy tax to be used for certain purposes specified in section 351.101, and section 352.002 authorizes certain counties to adopt such a tax for the purposes listed in subchapter B of chapter 352, Tax Code. A statewide car rental tax has long been imposed by section 152.026 of the Tax Code. Neither the state nor federal constitutions require an election prior to the imposition of either kind of tax. *See, e.g.*, *Kelly v. Macon-Bibb County Bd. of Elections*, 608 F. Supp. 1036 (M.D. Ga. 1985); *People ex rel. Stamos v. Public Bldg. Comm'n*, 238 N.E.2d 390, 398 (Ill. 1968). Thus, although the legislature chose in House Bill 92 to require an election in most counties to levy the special taxes authorized thereby, it was under no obligation to do so.

Nor does the imposition of a hotel occupancy or car rental tax without an election have due process implications. Taxation does not constitute a taking of property without just compensation under article I, section 17, of the Texas Constitution. *State ex rel. Pan Am Products Co. v. Texas City*, 303 S.W.2d 780, 782 (Tex. 1957), *appeal dism'd*, 355 U.S. 603 (1958). A reasonable exercise of the power of taxation does not constitute a denial of property without due course of law under article I, section 19, of the Texas Constitution. *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 316 S.W.2d 382, 385 (Tex. 1958), *rev'd on other grounds*, 361 U.S. 376 (1960).

You suggest that the case of *City of Houston v. Fore*, 412 S.W.2d 35 (Tex. 1967), stands for the proposition that due process requires the disclosure to referendum voters of "the method and rate of taxation." In that case, the city failed to notify a property owner of a hearing at which he could have challenged certain street paving assessments. Under the situation described in *Fore*, the legislature, in article 1105b, V.T.C.S., had permitted an administrative determination of the assessment rate rather than prescribing a fixed formula. Thus, due process required that an individual property owner be afforded the opportunity to contest his assessment. In House Bill 92, on the other hand, the legislature has set a fixed maximum rate for the hotel occupancy and car rental taxes imposed thereby. The taxes are of general applicability and do not vary on the basis of the benefit

---

[4]The ballot proposition reads:

> Authorizing Harris County to establish and operate new or renovated stadiums, arenas, and other facilities for professional baseball and football teams, provided that no county real or personal property taxes are spent to acquire, construct, or equip these facilities.

[5]The statute under which the referendum election was held, Local Gov't Code § 332.003, authorizes a county to "submit in an election of its qualified voters the question of whether it should exercise the powers conferred by this subchapter." Section 332.002 authorizes a county to "establish, provide, acquire, maintain, construct, equip, operate, and supervise *recreational facilities and programs . . . .*"

received by the taxpayer. As the court said in *Fore*: "[A]n owner ordinarily is not entitled to notice or hearing before assessment of the cost of public improvements in accordance with an inflexible legislative formula." *Id.* at 37. We conclude that the imposition of the hotel occupancy and car rental taxes imposed by House Bill 92 does not, in the absence of an election, contravene the due process clauses of the United States and Texas Constitutions.

You also ask whether section 7 of House Bill 92 discriminates against the voters of Harris County, in that it generally requires a referendum election prior to the imposition of the special hotel occupancy and car rental taxes, but provides that an election "is not necessary" in counties that have previously held an election to approve a venue project. In *Plyler v. Doe*, 457 U.S. 202 (1982), the United States Supreme Court declared:

> The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike.". . . The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*Id.* at 216. Furthermore,

> where individuals in the group affected by a law have distinguishing characteristics relevant to interests State has the authority to implement, the courts have been very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

*City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). While it may readily be acknowledged that House Bill 92 treats Harris County residents different from residents of many other counties, it is also the case that residents of Harris County, for purposes of the purposes sought to be achieved by that legislation, are not similarly situated to those of other counties. Harris County had previously held a referendum election only months before the enactment of House Bill 92. The legislature might have determined that the residents of Harris County were in fact adequately informed of the funding sources for the project.[6] For this reason, and because the cost of holding an

---

[6]Although the ballot proposition did not state that hotel occupancy and car rental taxes were to be employed as a funding mechanism, their probable use was widely reported in the media:

The major source of public funding for the ballpark will be $180 million from three sources:

(continued...)

election and the need to maintain public confidence in the finality of election results, the legislature may well have concluded that counties that had so recently held a referendum election on a venue project did not need to repeat the procedure. We believe a court would conclude that the classification scheme of House Bill 92, by obviating the need for an election in certain counties that had recently held a referendum election, sought to accomplish a "legitimate public purpose" by a "rational means," and that, as a result, House Bill 92 does not unconstitutionally discriminate against residents of Harris County on equal protection grounds.

Finally, you ask whether section 7 of House Bill 92 is a "local or special law," in contravention of article III, section 56 of the Texas Constitution. That provision states: "The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law . . . regulating the affairs of counties, cities, towns, wards, or school districts . . . ." The Texas Supreme Court has stated that "[t]he primary and ultimate test of whether a law is general or special is whether there is a reasonable basis for the classification made by the law, and whether the law operates equally on all within the class." *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex. 1996); *see also, Rodriguez v. Gonzales*, 227 S.W.2d 791, 793.

---

[6](...continued)

a countywide rental car tax, a limited downtown parking tax and state sales and liquor taxes generated in and around the stadium. Public dollars for the Astrodome will be hotel occupancy tax revenues and state sales and liquor tax dollars generated in and around the dome. John Williams, *Astros to Keep Home Base in Houston/Backers Face Uphill Fight in Winning Vote, Poll Shows*, HOUSTON CHRONICLE, Sept. 15, 1996, at A1, A19.

The question on the ballot carries some complicated and vague language, but the issue is fairly direct: Should the powers-that-be use a car-rental tax, a downtown parking tax, the hotel room tax and state sales and liquor taxes to foot the construction bills? Alan Bernstein, HOUSTON CHRONICLE, *Candidates' Playbook May Include Signals on Stadium Issue*, Sept. 22, 1996, at A38.

Instead, they intend to rely on hotel occupancy taxes, some state sales and liquor taxes and proposed taxes on rental cars and downtown parking. John Williams, *On Deck/The Stadium Vote/Stadium Vote Crucial to City, Advocate Says*, HOUSTON CHRONICLE, Sept. 22, 1996, at A1, A27.

A final financing plan is not in place, but Eckels in counting on hotel occupancy taxes, a proposed rental car tax and a downtown parking tax among public revenues needed for the two proposed projects. John Williams, *$20 Million in Property Taxes Spent on Dome*, HOUSTON CHRONICLE, Oct. 22, 1996, at A1, A8.

Bunch also said he opposes using public money--including hotel/motel or car rental taxes--to fund a downtown stadium. R.A. Dyer, *Voter's Guide, Texas House of Representatives--District 145*, HOUSTON CHRONICLE, Oct. 27, 1996, at 18.

"But because stadium construction would be paid for with other revenues that consumers have discretion over paying, such as rental-car and hotel-occupancy taxes, no vote is needed." John Williams and Dan Feldstein, *On Deck/The Stadium Vote/Questions Abound Regarding Vote on Stadium Proposal*, HOUSTON CHRONICLE, Nov. 3, 1996, at A1, A22.

For purposes of article III, section 56, analysis of the reasonableness of the classification imposed by section 7 is similar to the analysis applied to section 7 for purposes of equal protection and we therefore reach the same conclusion. In addition, section 7 operates equally upon all counties within the class described, *i.e.*, those counties which had held, or could have held, the requisite election prior to the effective date of House Bill 92. In our opinion, a court would probably conclude that section 7 is not a "local or special law" in contravention of the prohibition of article III, section 56 of the Texas Constitution.[7]

### S U M M A R Y

Harris County is not required to hold an election under the provisions of House Bill 92, Act of May 22, 1997, 75th Leg., R.S., ch. 551, 1997 Tex. Sess. Law Serv. 1929, 1929. The imposition of hotel occupancy and short-term car rental taxes does not, in the absence of a second election, contravene the due process clauses of the federal or state constitutions. Neither does House Bill 92 unconstitutionally discriminate against residents of Harris County on equal protection grounds. Section 7 of the bill is not a "local or special law" in contravention of article III, section 56, Texas Constitution.

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Rick Gilpin
Assistant Attorney General

---

[7]Because we believe that a court would find that section 7 is not a local or special law, we do not need to consider the relevance of article III, section 57 of the Texas Constitution.